UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE:<br>Steven Richard Aleckna<br>Jaime Sue Aleckna,<br><br>Debtors. | CHAPTER 13<br><br>CASE NO. 5:12-bk-03367-RNO |
| California Coast University,<br><br>Plaintiff,<br>v.<br><br>Jaime Sue Aleckna,<br><br>Defendant. | Adversary Proceeding<br><br>No. 5:12-ap-00247-MJC |

**ALECKNA'S REPLY BRIEF IN SUPPORT OF FEE APPLICATION**


s/Carlo Sabatini

Carlo Sabatini, Bar Number PA 83831
Attorney for Aleckna
Sabatini Law Firm, LLC
216 N. Blakely St.
Dunmore, PA 18512
Phone (570) 341-9000
Email ecf@bankruptcypa.com

## *I. Updated Initial Fee Request*

Some of Coast's objections are meritorious. To address those objections, counsel has updated each of the two bills: the pre-appeal bill from 2016, and the post-appeal bill that was first filed with the instant fee application. Those updated bills are attached hereto as Exhibit A. The dollar value of the objections that have been accepted amounts to 10.9% of the initial request.[1] Here is a breakdown of that request, as adjusted:

| | Pre-appeal bill | Post-appeal bill | Total |
|---|---|---|---|
| Fees before initial billing judgment | $158,575.50 | $93,048.50 | $251,624.00 |
| Reduction for initial billing judgment | -$34,490.50 | -$24,350.50 | -$58,841.00 |
| Net | $124,085.00 | $68,698.00 | $192,783.00 |
| Additional reduction for Coast's meritorious objections | -$16,717.00 | -$3,328.50 | -$20,045.50 |
| Net | $107,368.00 | $65,369.50 | **$172,737.50** |

| | Pre-appeal bill | Post-appeal bill | Total |
|---|---|---|---|
| Costs before initial billing judgment | $3,921.00 | $156.22 | $4,077.22 |
| Reduction for Coast's meritorious objections | -$1,420.41 | | -$1,420.41 |
| Net | $2,500.59 | $156.22 | **$2,656.81** |

[1] Counsel's accessions to Defendant's objections are made in a good faith effort to reach a fair resolution. See e.g., *Elaine v. Credit Control LLC*, 2018 WL 1705959, at *11 (E.D. Pa. Apr. 9, 2018) (In evaluating a fee application submitted by Sabatini, the Court stated: "After a line-by-line review, Plaintiff made significant reductions based upon Defendants' objections. These deductions are thoughtful and well-reasoned, and appear to have been made in a good-faith effort to reach a fair resolution of the fee issue.")

## *II. Introduction*

Trial courts usually have the advantage of witnessing the entirety of the case, including the conduct and competency of the attorneys, the complexity of the issues involved, and the effort put forth. This firsthand experience allows them to make more informed judgments than appellate courts regarding attorney's fees, which review cases based on the record and legal arguments presented rather than direct observation of the proceedings. Appellate courts generally afford deference to trial courts' decisions on attorney's fees because of this more informed view.

Here, the Court was not involved in the trial and is in the difficult position of having to rule on the attorney's fees without the benefit of having had that firsthand experience. One consequence of this lack of involvement is that it is more difficult for this Court to recognize in Coast's brief the hyperbole and the refusal to accept its own responsibility for the size of the attorney's fee request.[2] Coast's brief does not at all respond to the two pages of Aleckna's brief explaining the tenacity with which Coast has litigated this action. (Doc. 211, p. 7 – 8). Instead, Coast simply attacks Aleckna and her counsel – over and over again.[3] A lie told often enough becomes the truth.

---

[2] The original trial court implied that Coast was over-lawyering. Judge Opel observed that "As it has many times before, Coast argues that the failure to release a transcript is a [sic] not a violation of the automatic stay. . . ." He then took the time to identify eight separate filings where Coast made the argument and then dryly concluded that "[n]eedless to say, the motion is fully briefed and now ripe for disposition." (Doc. 120, p. 3)

[3] See, e.g., the first four pages of Coast's brief. (Doc. 212). "Aleckna churned this case for years" (p. 1); "Aleckna has made what should have been a relatively straightforward matter into a huge case." (p. 2); "her aggressive tactics" (p. 2); "the case was churned by Aleckna" (p. 3); "Aleckna aggressively litigated this simple case" (p. 4); "The size of the Court's file reflects the scorched earth litigation tactics of Aleckna's counsel." (p. 4); "Following 17 months of aggressive litigation by Aleckna" (p. 4).

As its attacks are mere characterizations, it is challenging for Aleckna to point to specific, discrete facts to clearly refute them. But Coast's adherence to unsupportable positions is readily seen in at least one instance. The Third Circuit chastised Coast for blatantly misrepresenting the record:

> [10] CCU's statement that its challenge was dismissed "without prejudice . . . since it was not necessary to have the issue of dischargeability decided," Appellant's Br. at 15 n.4, seems to blatantly misrepresent the record, *see* App. 816 (order of the Bankruptcy Court dismissing CCU's complaint "with prejudice").

*In re Aleckna*, 13 F.4th 337, 340 n.10 (3d Cir. 2021).

Incredibly, even after this criticism from the Circuit, on a fact which is so easy to verify, Coast persists by making the **exact** same misrepresentation again in its opposition brief here:

> on the dischargeability complaint. The complaint was later dismissed without prejudice by California Coast since it was not necessary to have the issue of dischargeability decided. (Adv. Dkt. Nos. 39, 42, 76, 77.)

(Doc. 212, p. 4).[4]

[4] Coast eventually withdrew its affirmative claim with prejudice. However, before doing so it first engaged in some interesting gamesmanship to try to have Aleckna's claim thrown out. After Aleckna had filed her initial answer and counterclaim, Coast sought consent to amend its complaint. Aleckna consented and Coast amended. Then Coast moved for voluntary dismissal of its own claim under Rule 41 asserting that there was no operative answer to the amended complaint. However, Coast sought to prevent Aleckna from proceeding on her counterclaim by asking for "closure of litigation between the parties and request[ing] that the Court determine that above adversary proceeding is rendered dismissed/closed." (Doc. 39, p. 3, ¶ 17) Judge Opel denied this request. (Doc. 44) Coast waited another nine months to drop its affirmative claim without strings attached. (Doc. 76). Also, Coast has never explained why all of a sudden it was no longer necessary to have the issue of dischargeability decided, one year after it initiated this action.

Other misrepresentations are more difficult to spot. For example, Coast said:

> Had Aleckna merely waited for her debt to be discharged (which occurred on April 18, 2016), she would have then had her financial hold end and graduate. All of Aleckna's many claims of damages were denied but for her being awarded $230.16 for taking off time from work to attend her trial of five hours.

(Doc. 212, p. 2).

Each of these two statements is misleading, at best. Coast points to nothing to support the statement that Aleckna would have been processed for graduation after discharge.[5] To the contrary, Judge Opel observed "Ms. Marquardt [Coast's Executive Vice-President] testified that as of the trial date, October 9, 2015, no decision had yet been made as to whether Aleckna would be allowed to graduate. Tr. Trial Tr. 74-75." (Doc. 152, p. 11). Additionally, Coast filed a nondischargeability action. If Aleckna had ignored that litigation, the debt would not have been discharged at all. Sitting on her hands was not an option.

The second sentence from the above quotation is similarly misleading. Coast said: "All of Aleckna's many claims of damages were denied but for her being awarded $230.16 . . . ." However, Aleckna was also awarded: a diploma[6], three certified transcripts containing a graduation date, and attorney's fees. (Doc. 153).

---

[5] The argument that this misleading statement is supposed to support is also silly. Aleckna should have just let Coast deprive her for *four years* of a diploma and graduation transcript that she was entitled to? And, trying to deflect this to Aleckna again demonstrates Coast's continuing refusal to accept blame. Rather than acknowledging that it was legally required to give her the transcript when she asked for it, Coast is implying that she did something wrong by not simply allowing it to continue to violate the automatic stay for four years.

[6] A diploma obviously has a very substantial worth. One way to estimate that amount could be to sum the tuition charges and the value of the more than one thousand hours of time that a student has to invest to earn the diploma.

Similarly, Coast inaccurately claims that the Court held that Aleckna did not need a transcript.

> Instead Aleckna churned this case for years pursuing monetary damages that were all denied since *Aleckna was found not to have any need for a transcript let alone a graduation transcript*. This Court's decision stated, "It is not for the Court to speculate as to possible losses and I cannot find an actual loss in this regard." (Adv. Dkt. No. 152 at 13.)

(Doc. 212, p. 1, emphasis added). This statement is false. Judge Opel did **not** hold that Aleckna had no need for a transcript. To the contrary, in holding that the failure to issue transcripts without a graduation date violated the stay, he "view[ed] a final transcript, with no graduation date, as akin to a letter of reference with no signature. Neither item is useful to the student recipient."[7] (Doc 152, p. 11). The statement that the Court would not speculate as to possible losses was simply the Court's finding that there was no evidence of monetary loss "due to the three and one half year delay in obtaining a B.S. from Coast." (Doc. 152, p. 12). Thus, damages for such loss would be speculative and the Court did not award them.

Coast claims that this case "was basically a legal issue that could be determined by briefing." (Doc. 212, p.1). It is true that this case *could* have been determined on the briefs, had Coast not chosen to deny the factual allegations. However, it was **Coast** who determined what issues would be joined in the case. If at the outset, Coast had admitted to the facts that it ultimately forced Aleckna to prove at trial, then this case would have been much simpler. Instead, for example over 18 months into the case Coast still would not admit that despite knowledge of the bankruptcy, it had refused to release the transcripts until the

[7] Judge Mariani agreed, stating "[i]ndeed, a transcript without a graduation date is essentially worthless." (Case 3:16-cv-00158-RDM, Doc. 32, p. 11)

account was paid in full. (Doc. 106, 110.) And on this point, Judge Opel found that "[t]here is no real contest that Coast did not promptly release any transcripts to Aleckna after she advised them by telephone of her bankruptcy filing." (Doc. 152, p. 5). He then "readily infer[red] that Coast's requiring Aleckna to meet her financial obligations, as a precondition to the release of her transcript, demonstrates an underlying purpose to collect on its prepetition claim." (Doc. 152, p. 6). By forcing a trial on an issue on which there was "no real contest," Coast prevented the case from being resolved on briefing.

And it wasn't just stubborn refusal to admit obvious **facts** that caused this case to drag out. Coast also pressed positions where it was very unlikely to prevail on the **law**. For example, Coast litigated long and hard the untenable position that it could withhold transcripts without violating the stay. The Third Circuit found that Coast "has not pointed to any compelling persuasive authority that supports its position . . . that a college does not violate the stay by refusing to give a student-debtor any transcript – complete or not. . . ." *In re Aleckna*, 13 F.4th 337, 344 (3d Cir. 2021). The Circuit further noted that "many other federal courts, including three of our sister circuits, have endorsed Aleckna's contrary view in similar, though not identical contexts. The two outlier cases on which [Coast] relies do not create a split of authority to render the law unsettled. . . ." *Id.* at 345 – 346 (footnote omitted).

So, Coast decided to litigate a fact on which there was no real contest, and to argue (and twice appeal) a legal position that was settled against Coast. Yet Coast says that it was Aleckna who was doing the churning.

Coast points out that the nondischargeability action was filed by "a literally brand new attorney who had never handled any case before and only charged $50 per hour." (Doc.

212, p. 4). Yet that lawyer, at that bargain rate, served his clients well. After his negotiations, Aleckna was willing to settle both the nondischargeability action and the counterclaim with an agreement that the debt was discharged and a payment of $10,000, inclusive of attorney's fees. An early settlement was a smart decision in a case where there was no real contest on the facts or the law.

Coast's replacement counsel successfully fought Aleckna's motion to enforce the settlement.[8] The short-sighted resistance to the initial settlement proved to be a costly misjudgment in light of the substantially higher amount Coast was ultimately compelled to pay its own attorneys, and the much greater exposure that it now has in the form of attorney's fees. Coast should re-evaluate which party really "has made what should have been a relatively straightforward matter into a huge case." (Doc. 212, p. 2).

What should replacement counsel have done? They could have immediately withdrawn the nondischargeability action with prejudice, immediately issued a diploma and transcripts with a graduation date and offered to compensate Aleckna for the attorney's fees that she had incurred to date. And, if Aleckna had refused, they could have tendered an offer of judgment under Rule 7068 conceding liability and providing that the court would determine the attorney's fees. They could have also filed an answer to the

[8] Note that Judge Opel did not find that there was no settlement. Instead, he merely ruled that Aleckna had failed to meet her burden to show that there was a settlement. Aleckna's counsel had spent over $1,000 in fees for a subpoena, a court reporter, and a local attorney to appear at a deposition of Coast's attorney to obtain the testimony to prove that the settlement had been reached. When Coast's attorney ignored the subpoena, counsel made the business judgment to not proceed with an expensive motion to enforce that would have had to be filed in California. The time and costs expended on this motion are an example of the risks borne by counsel who take cases on a fee shifting basis.

counterclaim admitting the facts and allowing a judgment on liability to be entered and proceeded to trial simply on damages.

Instead, they refused to settle. And, after they lost in the bankruptcy court, they decided that they didn't like the size of Aleckna's attorney's fee request – ***even though the request was less than they had already paid their own attorneys.*** So, rather than accept the outcome, Coast entrenched further and appealed. Twice. Note that Coast doesn't claim that it appealed because it felt that an appeal had merit. Instead, it was the size of the attorney's fee request that "caused California Coast to file a notice of appeal on the issue of willfulness." (Doc. 212, p.6). But now, after all this, Coast complains that the attorney's fee "should bear a reasonable relationship to the amount in controversy." (Doc. 212, p. 12)(quotation and emphasis omitted).

## III. Coast's Arguments

A. Diligence

Coast argues that the trial proceedings were two distinct phases: pre-amended counterclaim and post-amended counterclaim. Coast further argues that time spent before the amendment should largely be excluded for lack of diligence.[9] Coast asserts this argument for 113.20 hours of time.[10] Coast's argument fails for a number of reasons.

---

[9] Coast says that "[t]he Court should also exercise its discretion and disregard Ms. Aleckna's statement of Attorney's Fees and Costs due to the waste of resources of [Coast] and this Court from the filing of her Counterclaim of September 7, 2012 to the filing of her Motion to Amend Counterclaim of February 5, 2014." (Doc. 162, p. 11).

[10] Coast actually lodges the argument against 121.5 hours of time, but some of that time had already been discounted by Aleckna's counsel for other reasons in the exercise of billing judgment.

*1. The theory in the original counterclaim was fully retained in the amended counterclaim, and it was tried and decided in Aleckna's favor.*

Coast mischaracterizes the original counterclaim. Coast says that that claim was "only about a 17 day delay in her receiving a transcript (which she did not need)."[11] (Doc. 212, p. 2). This characterization is not accurate. The original claim did not at all measure (or complain about) the *amount of time* that it took Coast to send the transcript. Instead, the claim explained that Coast's leveraging the transcript to attempt to compel payment of the pre-petition debt violated the stay and caused Aleckna to incur attorney's fees to get Coast to turn over the transcript. Specifically, the counterclaim alleged as follows:

> 27. [Coast] acknowledged that it had received notice of the bankruptcy.
>
> 28. Nevertheless, the registrar refused to release the transcript until the account was paid in full.
>
> 29. The registrar told the debtor that she had checked with her supervisor and was told by the supervisor that a bankruptcy case does not require the school to release the transcripts to the debtor.
>
> ***
>
> 32. In [a letter to Coast], [Aleckna] provided [Coast] with the bankruptcy docket number and the date that the bankruptcy case was filed. [Aleckna] explained to [Coast] that her bankruptcy lawyer had advised her that due to the pending bankruptcy case, she was no longer required to satisfy the unpaid balance on the account to obtain a transcript.
>
> 35. [Coast] did not honor [Aleckna's] request for transcripts.

[11] See also, Doc. 212, p. 14. "The entire first 17 months of this case was only about whether it was reasonable for California Coast to have taken 16 days to send Aleckna her transcript once she sent in the required request for transcript form. That was the entire case, which is why California Coast had sought summary judgment."

> 36. Instead, [Coast] demanded that [Aleckna] "have the Bankruptcy Court of Middle District of Pennsylvania send a copy of your discharge papers as well as a copy of an official document showing California Coast University listed as a debt and has been discharged."
>
> 37. Defendant's bankruptcy counsel then sent an email to Plaintiff reiterating that the refusal to release the transcripts is a violation of the bankruptcy automatic stay, and also providing a copy of the bankruptcy petition and schedules. Plaintiff then released the transcripts.
>
> 38. Plaintiff's conduct violated 11 U.S.C. § 362(a).
>
> 39. As a result of Plaintiff's violations of the automatic stay, Defendant suffered actual damages in the form of out-of-pocket expenses, attorney's fees, and emotional distress.

(Doc 3, pp. 3-5).

Coast pretends this conduct was not the subject of the trial. It says "[t]he trial focused on the issue of whether California Coast was required to add a graduation date to Aleckna's transcript in order [sic] avoid violating the automatic stay. (Adv. Dkt. No. 152.) The issue of the 16 days for the transcript to be sent was now a nonissue." (Doc. 212, p. 5). Again, not true.

The first sentence is completely false.[12] Although the graduation date was **<u>one</u>** of the issues at trial, it was not **the focus**. Judge Opel describes two separate bases for the stay violations:

---

[12] The second sentence, regarding the "issue" of taking 16 days to send the transcript, was **<u>never</u>** an issue. As explained in Aleckna's post-trial brief:

> Aleckna is not complaining that it took Coast too long to release the transcript. Rather, she complains that the phone call with Cenina, and the subsequent email from Martinez, were stay violations which caused her to suffer damages.

> The crux of the first stay violation alleged in the Amended Counterclaim is that, after the Chapter 13 petition was filed on June 1, 2012, Coast continued to refuse to release transcripts to Aleckna. The second basis for the alleged stay violation is that when Coast did release a transcript to Aleckna, it failed to show that she had graduated, notwithstanding the fact that she had completed all the course requirements for the B.S. in Psychology.

(Doc. 152 p. 4.)

The entirety of Section III.B of Judge Opel's decision was on the first stay violation that he described – i.e., the facts described in Aleckna's claim before the amendment. The analysis in that section had nothing to do with a graduation date. See Doc. 152, pp. 4 – 8. He "readily infer[red] that Coast's requiring Aleckna to meet her financial obligations, as a precondition to the release of her transcript, demonstrates an underlying purpose to collect on its prepetition claim." (Id. at 6.) The final sentence in that section is "I conclude that the first required element to sustain a § 362(k) claim – a violation of the automatic stay – has been established." (Id. at 8.) Nowhere in that section did he discuss the omission of the graduation date from the transcript, or in fact, even use the word graduate. Nor did he use the word "diploma." The analysis of those aspects of the amended counterclaim is in the separate (and much shorter) § III.D of the opinion. See Doc. 152, pp. 10 – 11. Thus, he found that Coast's conduct, *as described in the original counterclaim*, violated the stay.

Coast also pretends that the additional facts provided in the amended counterclaim *replaced* the original claim. ("Her new claim was never part of the first 17 months of litigation or discovery and added a brand new ***replacement*** theory . . . .")(Doc. 212,

---

(Doc 149, p. 9, n. 8.) But, because Coast's papers characterize that untimeliness as the thrust of the initial complaint, what Coast really means to say here is: "the issue complained of in the original complaint was now a nonissue." That statement is false.

p.2)(emphasis added). Again, not true. The amendment merely provided additional allegations to *supplement* what was already in the original counterclaim. The only changes in the amendment were to add the word "amended" to the title, to add new paragraphs 50 – 55 (describing, *inter alia*, the failure to include a graduation date on the transcript or to award a degree), and to change the signature block. (See redline of amendment attached to the Motion to Amend, Doc. 99-2). Not a single word in the body of the original counterclaim was removed.

More importantly, the amendment did not add a new claim. Instead, it merely added additional facts to provide additional detail for the sole claim that was already there.[13] The trial was on the sole claim asserted by Aleckna – that Coast's post-petition conduct to collect a debt violated the automatic stay.

The second reason that Coast's argument (that the pre-amendment time should not be compensated) fails is that it is "law of the case" that the amendment was appropriate. "The law of the case doctrine directs courts to refrain from re-deciding issues that were resolved earlier in the litigation." *Pub. Int. Rsch. Grp. of New Jersey, Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 116 (3d Cir. 1997). Here, Coast complains that the amendment should not have been permitted and explains that Coast had instead asked that Aleckna be required to file a separate action. (Doc. 212 p. 5.)(Aleckna "file[d] an amended counterclaim

---

[13] The Original Counterclaim and Amended Counterclaim each consisted of two counts. Count 2 was for attorney's fees related to Count 1. Under the version of Rule 7008 that was in effect at the time, a demand for attorney's fees was required to be pleaded separately as its own claim. That rule has since been amended. See Advisory Committee Notes to 2014 Amendments to Bankr. Rule 7008. ("The rule is amended to delete subdivision (b), which required a request for attorney's fees always to be pleaded as a claim in an allowed pleading.")

(versus a new action as requested by California Coast) to include the [transcript] allegations)")(brackets added but parenthetical in original). However, Judge Opel has already decided that these more specific allegations were properly part of this case. He stated that "[b]ecause the new paragraphs contained information that was related to the same case or controversy as the original counterclaim, [he] granted leave to amend." (Doc. 120, p. 3.) If Coast disagreed with this decision, it could have appealed. It did not appeal this issue, and that determination is now final. The law of the case doctrine prevents them from re-litigating the issue now.

*2. Coast's supporting caselaw is not helpful.*

Coast provides only one case for its "diligence" argument – *In re Golden Recipe Chicken, Inc.*, 109 B.R. 692 (Bankr. W. D. Pa. 1990). There the case started as a Chapter 11 but was eventually converted to a Chapter 7. The debtor's attorney filed a fee application and the bankruptcy court found that there was no reasonable basis for the case to have been in Chapter 11, so the additional fees that were incurred beyond what would have been charged for a Chapter 7 case were not warranted. In making its decision, the court used the word diligent one time: "Diligent counsel would have simply filed the chapter 7 petition with schedules. . . ." The applicability of this case here is dubious. Although the court used the word diligent, what it was really saying was simply that fees would not be awarded for wasteful work that didn't serve a purpose.

Rather than diligence, what Coast really seems to be arguing is for apportionment. And, though they didn't cite the case for this principle, one of the cases in its brief does discuss apportionment; Judge Caputo's decision in *Jama* explains that "where a plaintiff presents distinctly different claims for relief that are based on different facts and legal

theories . . . work on an unsuccessful claim cannot be deemed to have been expended in pursuit of the ultimate result achieved." *Jama Corp. v. Gupta*, 2008 WL 108671, at *3 (M.D. Pa. Jan. 4, 2008)(quotation marks and citations omitted).

The Supreme Court has long held that "[l]itigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee. The result is what matters." *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983). Thus, the Seventh Circuit has stated that "*Hensley* permits the court to award fees for losing arguments in support of prevailing claims, but not for losing claims . . . ." *Pressley v. Haeger*, 977 F.2d 295, 298 (7th Cir. 1992); *see also Jaffee v. Redmond*, 142 F.3d 409, 414 (7th Cir. 1998)("just as *Hensley* dictates that fees incurred on unsuccessful but related claims may be compensable, we have recognized that courts may award fees for time reasonably spent on an unsuccessful argument in support of a successful claim."). And, as noted by the Ninth Circuit:

> Rare, indeed, is the litigant who doesn't lose some skirmishes on the way to winning the war. Lawsuits usually involve many reasonably disputed issues and a lawyer who takes on only those battles he is certain of winning is probably not serving his client vigorously enough; **losing is part of winning**.

*Cabrales v. Cnty. of Los Angeles*, 935 F.2d 1050, 1053 (9th Cir. 1991)(emphasis added).

Appellate courts around the country have found that it is appropriate to award fees for unsuccessful efforts that were related to a successful claim. *See, e.g., id.* ("If a plaintiff ultimately wins on a particular claim, she is entitled to all attorney's fees reasonably expended in pursuing that claim-even though she may have suffered some adverse rulings."); *Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1342–43 (2d Cir.1994)(court did not abuse discretion when awarding attorneys' fees for unsuccessfully opposing a

summary judgment motion because that opposition was "thoroughly intermingled" with the plaintiff's successful claims); *Seigal v. Merrick,* 619 F.2d 160, 165 (2d Cir. 1980) (reversing a fee decision where time was reduced for "unfruitful," but not frivolous claims); *Air Transp. Ass'n of Can. v. FAA,* 156 F.3d 1329, 1335 (D.C.Cir.1998)("a litigant who is unsuccessful at a stage of litigation that was a necessary step to her ultimate victory is entitled to attorney's fees even for the unsuccessful stage.")(internal quotation marks omitted)(quoting *Cabrales*, 156 F.3d at 1335).

A number of trial courts have similarly awarded fees for unsuccessful motions. *See, e.g., Guetzloe Grp., Inc. v. Mask*, 2007 WL 2479335, at *3 (M.D. Fla. Aug. 28, 2007) ("Although the Eleventh Circuit has directed courts to deduct fees for discrete and unsuccessful claims, there is no requirement that the district court deduct fees for discrete and unsuccessful motions.")(emphasis added); *Luessenhop v. Clinton Cnty., N.Y.*, 558 F. Supp. 2d 247, 256-57 (N.D.N.Y. 2008) *aff'd,* 324 F. App'x 125 (2d Cir. 2009)("a prevailing party is not limited to recovery on successful motions alone. Indeed unsuccessful motions too are compensable as long as they are not frivolous."); *Blissett v. Casey*, 969 F. Supp. 118, 130 (N.D.N.Y. 1997) *aff'd,* 147 F.3d 218 (2d Cir. 998)(awarding fees for time spent on an unsuccessful motion for an interlocutory appeal); *L.H. v. Schwarzenegger*, 645 F. Supp. 2d 888, 897 (E.D. Cal. 2009)(awarding fees for two unsuccessful motions that were "reasonably related" to the successful claims); *Lintz v. Am. Gen. Fin., Inc.*, 87 F. Supp. 2d 1161, 1167 (D. Kan. 2000)(awarding time for an unsuccessful motion for sanctions because there was no evidence that the motion was meritless); *Heller v. D.C.*, 832 F. Supp. 2d 32, 55 (D.D.C. 2011)(awarding fees for time reasonably spent on various unsuccessful procedural motions because the plaintiff was ultimately successful); *Deferio v. Bd. of Tr. of State Univ. of*

*New York*, 2014 WL 295842 (N.D.N.Y. Jan. 27, 2014).

In fact, the Third Circuit has held that time spent on a motion that was never even filed can be compensable where the briefs were relied upon in later stages of the trial. *Planned Parenthood of Cent. New Jersey v. Attorney Gen. of State of New Jersey*, 297 F.3d 253, 271 (3d Cir. 2002)("Since the summary judgment brief was eventually submitted in lieu of a pre-trial brief, and a post-trial brief, the work was certainly 'necessary' and 'useful,' and we therefore affirm the award of fees.").

Here, Coast's argument seems to be that the first 17 months of the litigation were based on different facts and legal theories and that this Court should apportion the fees and costs between the two different phases of litigation, and not award any of the fees for the first phase. However, as explained in the previous section, the theory in the original counterclaim was fully retained in the amended counterclaim, and it was tried and decided in Aleckna's favor. Additionally, all of the facts were related to the single claim. Again, although apportionment might be appropriate where work was spent on unsuccessful *claims*, the same is not required for unsuccessful theories or motions that were related to a successful claim. Thus, apportionment to reduce fees for pre-amendment time would be inappropriate here.

However, Aleckna does concede that Coast has the better argument with respect to time which was spent *solely* on the Motion to Enforce Settlement. Most of that time had already been discounted on the original bill. Counsel has re-evaluated the bill and made additional discounts to ensure that no such time remains. However, some time that was spent in connection with that motion would have been incurred whether or not the motion had been filed. Such time is properly billed. One example is time spent traveling to and from

court to attend a hearing on Coast's Motion to Strike Aleckna's Counterclaim. (Doc. 9). That hearing was held at the same time as a hearing on Aleckna's Motion to Enforce Settlement (Doc. 10). The travel time would have been necessary whether or not the motion to enforce had been filed. Thus, the time should be compensable *in full* and should not be discounted 50% to account for the motion to enforce.[14]

B. The Time on Appeal

Coast claims that the time for its two appeals should not be compensated. They are partly correct. Third Circuit L.A.R. 108.1 does require a party seeking fees for time spent before the Circuit to file its fee application in the Circuit. Because that application was not timely filed, those fees have not been sought before this Court. Instead, when this application was filed, all time had already been discounted from the date that the Circuit appeal was filed through the date that the Circuit issued its mandate. See Doc 210-2, pp. 9 – 12.[15]

However, time for the appeal to the district court should be compensated. An award of fees under § 362(k)(1) includes time spent defending a judgment on appeal. *In re Horne*, 876 F.3d 1076, 1082 (11th Cir. 2017). Coast does not seem to challenge that fees should ordinarily be awarded. Instead, Coast argues that an exception to the usual rule is

[14] Note that over 20 hours were spent preparing for and attending these two hearings. However, the bill did not explain *which* of the two hearings was being prepared for. Thus, in a very aggressive exercise of billing discretion all of that time was written off, even though a substantial part of it surely was attributable to the hearing on the motion to dismiss.

[15] Aleckna's counsel made this mistake and has to own it. But the mistake – which cost counsel the opportunity to recover over $22,000 in fees for time spent on the appeal – again highlights a risk for attorneys that take cases on a fee shifting basis. Everyone makes mistakes. However, the possibility of this mistake with this consequence of non-payment is present only in a fee shifting case. It also represents a windfall to Coast, which is now permitted to retain money for fees that it would have been required to pay.

appropriate here for two reasons: first, it argues that the request is untimely under Rule 54, and second, it claims that the fees were not provided for in Judge Mariani's "mandate."

1. *Rule 54 is not a bar.*

a. Rule 54 does not apply at all.

The Federal Rules of Civil Procedure, including Fed. R. Civ. P. 54, do not apply to appeals from the bankruptcy court. Instead, appeals are governed by the specific rules for bankruptcy appeals that are set forth in Part VIII of the Federal Rules of Bankruptcy Procedure. "These Part VIII rules govern the procedure in a United States district court . . . on appeal from a judgment, order or decree of a bankruptcy court." Fed. R. Bankr. P. 8001(a).

In *In re Vaughan Co., Realtors*, 2018 WL 1183363 (D.N.M. Mar. 6, 2018) a party to bankruptcy court proceedings appealed to the district court. The district court dismissed the appeal as untimely. The appellant then filed a motion to vacate that dismissal order and cited to Fed. R. Civ. P. 60 to support its motion to vacate. The district court denied that motion and explained that the Federal Rules of Civil Procedure do not apply to an appeal from the bankruptcy court. *Id.* at *1. Instead, as Fed. R. Bankr. P. 8001 says that the Part VIII rules govern the procedure on appeal, the **exclusive** vehicle for the appellant to seek rehearing was under those rules, and specifically under Fed. R. Bankr. P. 8002. *Id.*

The Federal Rules of Civil Procedure do not apply to the appellate proceedings, so Fed. R. Civ. P. 54 is not a bar to recovery.

b. Alternatively, even if Rule 54 applies, the request for fees is timely.

Judge Opel's judgment was entered on January 14, 2016. (Doc. 153.) Fourteen days later, Aleckna timely submitted a statement of fees and costs. (Doc. 155.) That statement

satisfied the requirements of the rule to "state the amount sought **or provide a fair estimate of it**; . . ." Fed. R. Civ. P. 54(d)(2)(B)(iii)(emphasis added). The rule's explicit direction that the amount stated need only be a "fair estimate" contemplates that additional amounts may later be sought beyond the amount of the initial application. Those additional amounts could arise not only in the context of an appeal, but also as subsequent time that might be spent in the trial court even without an appeal – such as for a reply brief or attending a hearing on the fees. The rule does not provide any deadline by which a request must be made for any supplemental amounts. The absence of a deadline makes sense, because the possible post-trial proceedings are so varied that a one-size-fits-all approach would not work. Arbitrary deadlines for supplemental requests – such as within a specific number of days of the fees being incurred – could readily multiply the proceedings by requiring numerous supplements to be filed to ensure that the deadline is not missed.

Thus, the Rule 54 14-day requirement imposes a filing deadline on only the initial statement of fees. That deadline was met here.

*2. The District Court's "mandate"*

In the first paragraph of his opinion, Judge Mariani explained that he would be affirming the bankruptcy court's order and that he would then "remand the case in accordance with the Bankruptcy Court's order for a determination of attorneys' fees and costs." (3:16-cv-00158-RDM, Doc. 32, p. 1)

What types of attorney's fees and costs would be left to the determination of the bankruptcy court? Later in his opinion, he describes the three different classes of attorney's fees that Aleckna was entitled to receive. Specifically, he said that Aleckna is "entitled to

attorney's fees incurred to vindicate her rights under the statute, prosecute the action, and defend the judgment on appeal." (3:16-cv-00158-RDM, Doc. 32, p. 17.)

The first class – fees to vindicate her rights under the statute – are the "defensive" attorney's fees recognized by Judge Opel, Judge Mariani, and the Third Circuit as the fees that Aleckna paid out-of-pocket to convince Coast to release the transcript before this adversary proceeding was filed. (Opel at Doc. 152, p. 13)("[t]he judgment will allow Aleckna . . . attorneys' fees and costs incurred in seeking to obtain graduation transcripts and in this adversary proceeding."); (Mariani at 3:16-cv-00158-RDM, Doc. 32, p. 16)("[Aleckna] sustained an injury through the costs incurred to vindicate her rights under the Bankruptcy Code and ultimately obtain the transcript. Indeed as Judge Opel found, appellee incurred fees to consult with an attorney and attend legal proceedings."); (Third Circuit at p. 22)("Aleckna identifies several additional forms of relief awarded by the District Court that address her injuries, including: (1) three copies of her certified transcript containing a graduation date; (2) a diploma; and (3) the prelitigation attorneys' fees she incurred while attempting to obtain her complete transcript.[51]")[16]

[16] The Circuit's apparent finding that the District Court did award these fees is contradicted somewhat by footnote 51 in the Circuit's opinion, which says:

> The parties dispute whether Aleckna was actually awarded "pre-litigation" fees—i.e., the "defensive" attorneys' fees she incurred attempting to resolve the issue out of court before the litigation ensued. Appellee's Br. at 55-56. We need not resolve that issue here, however, because we conclude that Aleckna was injured by the University's violation of the stay regardless.

*In re Aleckna*, 13 F.4th at 347.

The second class of fees that Judge Mariani found Aleckna was entitled to receive was attorney's fees to "prosecute the action" – i.e., fees for time spent in the proceedings before Judge Opel. And, of course, the third class of fees that Judge Marani found Aleckna was entitled to was attorneys' fees to "defend the judgment on appeal." (3:16-cv-00158-RDM, Doc. 32, p. 17)

With that background, let us look now at the accompanying remand order.[17] That order affirmed the bankruptcy court's decision, closed the case in the district court and remanded. The relief that Judge Mariani described in his remand order mirrored ***almost*** verbatim the still outstanding issues[18] from the order that Judge Opel had entered. Judge Opel had awarded to "Aleckna . . . attorneys' fees and costs incurred in seeking to obtain graduation transcripts and for legal representation in this adversary proceeding." (Doc. 153). Judge Mariani remanded for determination of "attorneys' fees and costs incurred **by Jamie Sue Aleckna** in seeking to obtain graduation transcripts and for legal representation in ~~this~~ **the** adversary proceeding**s**." Doc. 194 (emphasis added to indicate modifications).

The only substantive change in Judge Mariani's order was to make the term "adversary proceedings" plural. Thus, Judge Mariani was clearly sending the case back

---

[17] Coast describes the district court's order as a "mandate" and asserts that "[t]he law is crystal clear for more than 100 years that the mandate of a court is to be literally read and applied. . . .The mandate is what the lower court must narrowly follow." (Doc. 212, p. 28). Coast provides a number of cases describing a circuit court's mandate to a district court. What Coast does not provide is any authority that a district court, sitting as an appellate court under 28 U.S.C. § 158(a), is to issue a mandate to a bankruptcy court. In fact, "the device of a mandate does not even exist in the case of a district court's judgment disposing of an appeal from a bankruptcy court." *In re Capitol Hill Grp.*, 330 B.R. 1, 2 (Bankr. D.D.C. 2005).

[18] In addition to the amounts that remained to be determined, Judge Opel had already awarded $230.16 in actual damages and had ordered delivery of a diploma and certified transcripts with a graduation date. (Doc 153.)

down for a determination of all three classes of fees: (1) the defensive fees for Aleckna's out-of-pocket, pre-litigation amounts incurred to her attorney for help obtaining the transcripts, (2) the time spent prosecuting the action before Judge Opel, and (3) the time spent defending the appeal before Judge Mariani.

And this decision to consolidate the fee determination reflected wise judicial economy. Just as Judge Opel had found that it would be wise to consider the "defensive" attorney's fees at the same time as the fees for prosecuting the action, Judge Mariani found that it would be sensible to consider the appeal fees as part of the same proceeding, rather than having fee applications pending in two separate courts. Additionally, Judge Mariani was sitting in an appellate capacity. Generally, appeals courts do not consider factual issues in the first instance, and instead let those initial determinations be made by the trial court.[19]

C. Miscellaneous

Coast's presentation contains various additional inaccurate statements, or positions that are not well taken.

1. *"Aleckna could have filed a motion for contempt of the automatic stay against CCU in order to resolve the issue as soon as possible without incurring such astronomical attorneys' fees and costs. 28 U.S.C. §105 and Bankruptcy Rule 9020."* (Doc 162, p. 3)

First, there is no reason to think that a motion for contempt would have been any more economical than an adversary proceeding. Second, it would have been poor judgment to decide to forego the clear private right of action afforded by § 362(k) in favor of less certain relief under § 105. *See e.g., In re Cont'l Airlines,* 203 F.3d 203, 211 (3d Cir.

[19] Obviously, there can be exceptions when specifically provided for by the appellate court's rules, such as in the Third Circuit.

2000)("section 105(a) has a limited scope. It does not 'create substantive rights that would otherwise be unavailable under the Bankruptcy Code.'"); *In re Joubert*, 411 F.3d 452, 455 (3d Cir. 2005)("To add private causes of action to § 105(a)'s arsenal of remedies, we would have to conclude that such was the intent of Congress.") Third, Aleckna would have faced a much higher burden. Contempt must be proven by clear and convincing evidence with any ambiguities resolved against Aleckna. *In re Ransom*, 599 B.R. 791, 802 (Bankr. W.D. Pa. 2019). A claim under § 362(k) must merely be proven by a preponderance of the evidence. *In re Toppin*, 637 B.R. 88, 109 (Bankr. E.D. Pa. 2021), *aff'd*, 645 B.R. 773 (E.D. Pa. 2022). And finally, as observed by Judge Opel, "by raising the alleged stay violation as a counterclaim, rather than by a separate motion or adversary proceeding, Aleckna's counsel reduced the proceedings." (Doc. 71, p. 9). Aleckna wisely chose the more certain and more economical route.

2. "Over lawyering"

Coast accuses the case of being over-lawyered and says that three attorneys were used for numerous entries of research, preparation, and attending hearing. Using multiple attorneys is an efficiency. It allows the less senior attorneys to spend time on the more basic tasks at a more economical rate. Coast has not explained how the use of three attorneys was inefficient, or how it caused services to be more expensive than if they had all been performed by just one attorney that was charging the highest hourly rate.

3. Briefing

Coast's largest category of challenges is to the time entries associated with researching and drafting various briefs. After the exercise of billing judgment, such as excluding time for the Third Circuit briefs, that time totals 221.6 hours.

The Third Circuit has evaluated the reasonableness of a fee request for briefing by looking at the amount of time spent per page. Specifically, in *Maldonado v. Houstoun*, 256 F. 3d 181 (3d Cir. 2001), the Third Circuit had to determine how much time to award for an appellate brief. The court observed that the briefing task was not complicated. The brief addressed only a single issue. The appellate attorneys had also represented the party before the district court and had briefed the same issue there as well. *Id.* at 186. Further, the district court had written an opinion setting forth the pertinent law. *Id.* With this experience addressing the issue, the claimant's attorneys had a simple briefing task. The court awarded 120 hours of time for a 41-page brief. *Id.* This award amounts to about three hours per page.

Subsequently, this hours-per-page analysis was also used by the court in *Walton v. Massanari*, 177 F. Supp. 2d 359 (E.D. Pa 2001). There, the court observed that the *Maldonado* court approved three hours per page and determined that the claimant's request for "53.6 hours reported for a 27 page brief, which is approximately 2 hours per page, [was] reasonable." *Id.* at 365.

This approach has also been followed in this district. *See Gryzbowski v. I.C. Sys., Inc.*, 2010 WL 2507516, at *3 (M.D. Pa. May 24, 2010)(Prince, M.J.) *report and recommendation adopted,* 2010 WL 2470853 (M.D. Pa. June 15, 2010)(Vanaskie, J.)("Moreover, in addressing the briefing of dispositive motions, Plaintiff has demonstrated that his hours per page fall within the range of what this court has concluded to be reasonable.").[20] And, in *Styers v. Pennsylvania*, 621 F. Supp. 2d 239, 244 (M.D. Pa. 2008)(Caldwell, J.), the court allowed 48

[20] In *Gryzbowski*, the court granted a request of 49 hours for 22 pages of briefing – i.e., 2.2 hours per page. Docket 3:08-cv-01884-TIV at Doc. 36 p. 3 and footnote 1.

hours for the preparation of a thirteen-page brief (i.e., 3.6 hours per page) where the issue being litigated was "fairly straightforward and did not present any particularly difficult or novel issues of law."

Here, Aleckna's briefing time was a mere fraction of the time awarded by these other courts. At 221.6 hours, Aleckna spent 1.2 hours per page, which is only 40% as much time on each page of briefing as did the *Maldonado* lawyers. Although Coast has objected to all but 26.8 hours of briefing time, there was nothing that was actually excessive. Because the time spent briefing was reasonable and necessary in pursuing this action, Aleckna should be awarded all of the time incurred on these briefing tasks.[21]

4. Excessive hourly rates

Coast does not complaint that Aleckna's counsel's claimed hourly rates are too high in 2023 or 2024. Instead, Coast claims that since some of the services were performed in 2013, then the rates that Aleckna's attorney was charging in 2013 should be used. (212 p. 18).

However, the Third Circuit has specifically held that in a fee shifting case the rates awarded should be the **current** hourly rates. *Lanni v. New Jersey*, 259 F.3d 146, 149 (3d Cir. 2001)("When attorney's fees are awarded, the current market rate must be used."). The court clarified that "[t]he current market rate is the rate at the time of the fee petition, *not the rate at the time the services were performed*." Id. (emphasis added). *Lanni* permits

---

[21] Careful, diligent, and original briefing takes time. It bears repeating that Coast's attorneys charged their client more than Aleckna seeks here. But at least one part of their brief in opposition to this fee request contains a substantial amount of material that was copied from a different source without attribution. *Compare, In re Preston,* 333 B.R. 346, 351 (Bankr. M.D.N.C. 2005) *with* (Doc 162, p.11 string citation starting at *Shadduck*).

retroactive increases due to the theory of "delay compensation." *Lanni*, 259 F.3d at 149-50. Obviously, where a client is paying for legal services on a regular basis, the theory of delay compensation discussed in *Lanni* does not apply. In such a case, there is no significant delay between when the services are performed and when a bill is sent to a client. Instead, an attorney could generally expect to be paid within a month of performing the services. Here, the case has taken over 11 years (so far).

Aleckna is entitled to recover for all time spent using her counsel's current rates.[22]

5. *In re Robinson*, 228 B.R. 75, 85 (Bankr. E.D. N.Y. 1998).

Coast cites this case for the proposition that "Debtor's counsel is not at liberty to incur large legal fees and costs simply because those fees and costs will be shifted to their adversaries." (Doc. 212, Exhibit 1, p. 7) The size of the fees that were incurred here is not because they will be shifted to adversaries. Instead, it is what was necessary to litigate this case. Again, Coast's counsel charged more, even though it knew that its own client would be paying the fee.

[22] However, Coasts' complaint regarding Gryskewicz's rate is well-taken (Doc 212, p. 17). Because of *Lanni*, counsel recently updated the timesheets to reflect the current hourly rates of all timekeepers. As Gryskewicz is no longer employed by Aleckna's firm, a rate based on his current experience was approximated and the rate of $300 per hour was selected. After each time-keeper's rate had been entered into the time-keeping software, a command was run on the system to update all time entries to be re-calculated at the current rates. During that process, counsel did not remember that some of Gryskewicz's time had been billed before he was admitted to the bar on October 15, 2015. Thus, although the original time sheets had two different hourly rates for Gryskewicz: $160 per hour as a law school graduate and then $200 per hour as a new lawyer (see Doc. 155), the updated time sheets did not make that distinction. Counsel regrets the oversight and, rather than updating those rates to a 2023 rate, the most recent time sheets have returned his rate to the original rates of $160 and $200.

6. Proportionality

Coast's brief screams about the proportionality of the initial fee request: **"This is approximately 560 times her monetary[23] recovery."** (Doc 212 p. 6, emphasis in original). However, Coast makes no effort to explain why this statement is relevant, or to respond at all to Aleckna's authority as to why proportionality is not a proper consideration when awarding attorney's fees pursuant to a fee shifting statute. (Doc. 211, starting at p. 5.)

## IV. Supplemental Request

Aleckna's counsel seeks additional time in connection with the preparation of this brief. The time spent is as follows:

| | | | | |
|---|---|---|---|---|
| 11/26/2023 | CS | 5.1000 | $415.0000 | $2,116.50 |
| 11/27/2023 | CS | 2.1000 | $415.0000 | $871.50 |
| 12/1/2023 | CS | 0.1000 | $415.0000 | $41.50 |
| 12/5/2023 | CS | 5.4000 | $415.0000 | $2,241.00 |
| 12/6/2023 | CS | 7.0000 | $415.0000 | $2,905.00 |
| 12/7/2023 | CS | 10.2000 | $415.0000 | $4,233.00 |
| 12/8/2023 | CS | 12.1000 | $415.0000 | $5,021.50 |

On November 26, 2023, counsel read Coast's brief and, while reading the brief, outlined arguments to make in reply. On each of the rest of the days, counsel wrote the brief and researched. Research was contemporaneous with the writing, because as a legal issue would arise for which authority was needed, counsel would do the research and then write that part of the brief.

Although the time spent of 42 hours amounts to $17,430, counsel seeks $15,000. This 14% reduction brings the time for this briefing down to an effective rate of

[23] Note that Coast makes no effort to place a value on the diploma and graduation transcripts that Aleckna also received. See n. 6, *supra.*

approximately 1.2 hours per page, which was the average time billed for the other briefs in this case.

## V. Conclusion

Aleckna respectfully submits that the total reasonable award of fees and costs should be $190,394.30. That figure is the amount of the previously submitted bills, as adjusted, totaling $172,737.50 for fees and $2,656.81 for costs and an additional $15,000 for this brief. From this amount, counsel would offer an additional deduction of 5% to account for any reasonable disagreement over the remaining portion of the bill[24], for a total fee and costs request of $180,874.60.

[24] See *Elaine v. Credit Control LLC*, 2018 WL 1705959, at *11 n. 13 (E.D. Pa. Apr. 9, 2018)(noting the practice of the Sabatini Firm in applying a supplemental discount to bills).